UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WANGLAP YAM, individually and on behalf of all others similarly situated,

Plaintiff,

-v.-

QI XIN, also known as BRANDON QI, and CHINA SUMMIT CAPITAL, LLC,

Defendants.

23 Civ. 9793 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:[1]

Plaintiff Wanglap Yam brings this putative class action against Defendants Qi Xin and China Summit Capital, LLC ("China Summit Capital"), of which Mr. Xin is the registered agent and only member, alleging the provision of fraudulent college consulting services. Plaintiff advances a federal civil claim under 18 U.S.C. § 1962, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as a state-law statutory claim for violations of the New York Consumer Protection Act, N.Y. Gen. Bus. Law § 349, and state common-law claims for fraud, negligent misrepresentation, and breach of contract. Before the Court is Defendants' motion to dismiss Plaintiff's Second Amended Complaint (the "SAC") for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As set forth in the remainder of this Opinion, the Court finds that it has subject matter jurisdiction over Plaintiff's

1 Lucas T. Gazianis, a rising second-year student at Columbia Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

civil RICO claim, but that Plaintiff fails to state a civil RICO claim. And because the Court dismisses the federal-law claim over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over any related state-law claims. Accordingly, the Court grants Defendants' motion to dismiss in full.

## BACKGROUND[2]

### A. Factual Background

#### 1. The Parties

Plaintiff is a Chinese citizen who resides in Hong Kong, China. (SAC ¶ 1). Defendant Qi Xin, also referred to by the name Brandon Qi, is alleged to have resided in Washington and New York, to maintain a residence in New York, and to be pursuing U.S. citizenship. (*Id.* ¶¶ 2, 8). Defendant China Summit Capital, of which Mr. Xin is the registered agent and only member, is alleged to be a Washington limited liability company domiciled in "Washington and/or New York." (*Id.* ¶ 3). At the time of the SAC's filing, China Summit Capital's website stated that Mr. Xin is its founder and CEO and that China Summit

---

[2] This Opinion draws its facts from the Second Amended Complaint ("SAC" (Dkt. #80)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on Plaintiff's First Amended Complaint ("FAC" (Dkt. #67)) and an exhibit thereto (FAC, Ex. 1 ("Contract")), which are incorporated by reference in the SAC. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #90); to Plaintiff's memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #94); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #95).

Capital is a subsidiary of a multinational corporation called Zhongsheng International Group, a "capital group integrating real estate investment, immigration, high-end study abroad, unicorn equity and IPO investment, family trust, etc." (*Id.* ¶ 5). Mr. Xin's China Summit Capital business card, which describes Mr. Xin as founder and chairman of the organization, lists New York and Shanghai as locations. (*Id.* ¶ 9). Plaintiff, consistent with the business card's representations, alleges that China Summit Capital maintains an office and operates in New York. (*Id.* ¶ 10).

**2. Plaintiff's Request for College Consulting Services**

In late 2022 and early 2023, Plaintiff's daughter was applying to "some of the top colleges in the United States." (SAC ¶ 21). Plaintiff "wanted to help his daughter have the best chance for admission." (*Id.* ¶ 22). So began Plaintiff's involvement with Mr. Xin and China Summit Capital. (*Id.* ¶¶ 23-25).

The parties' first contact occurred at some point at the end of January or beginning of February 2023, when Chu Pui Lam, who worked at Bright Range Limited and served as an intermediary and Plaintiff's broker, first spoke with Mr. Xin about his college consulting services. (SAC ¶¶ 23, 32). Mr. Xin provided Ms. Pui Lam with his business card and represented that IvyMountain International, LLC ("IvyMountain International"), a subsidiary of China Summit Capital that Plaintiff alleges does not actually exist (*id.* ¶ 16), "had extensive staff, connections, and expertise for helping students gain admission into the top U.S. colleges" (*id.* ¶ 23). Ms. Pui Lam relayed that information to Plaintiff, who accessed China Summit Capital's website and

subsequently exchanged direct messages with Mr. Xin. (*Id.* ¶¶ 25-26). According to Plaintiff, the website stated that "IvyMountain International had assembled an elite team of admissions officers from the Top 30 most prestigious schools in the United States, including professional consultants, career development mentors and clerical teachers." (*Id.* ¶ 25). Meanwhile, in direct conversations, Mr. Xin told Plaintiff that IvyMountain International "would provide comprehensive educational consulting services to help [Plaintiff's] daughter gain acceptance into elite U.S. colleges." (*Id.* ¶ 26).

In reality, Plaintiff pleads that Mr. Xin's representations on the website and to Ms. Pui Lam and Plaintiff "were false on many levels." (SAC ¶ 28). IvyMountain International "had no employees and cannot even legally operate in New York." (*Id.*). There was no "staff of admissions officers or any other special expertise, or connections that would help [Plaintiff's] daughter gain admission into a top college in the United States." (*Id.*). Consequently, Plaintiff concludes that "IvyMountain International, LLC did not intend to provide the services Mr. Xin represented it would" and that Mr. Xin "*knew* [his representations] were false." (*Id.* ¶¶ 28-29). In other words, Mr. Xin "was trying to induce [Plaintiff] into paying him hundreds of thousands of dollars based on those representations." (*Id.* ¶ 30). And, according to Plaintiff, Mr. Xin succeeded.

### 3. The Parties' Contract for College Consulting Services

Plaintiff entered into a "Commission Contract for School Application Services" (the "Contract") with IvyMountain International on February 6, 2023.

(SAC ¶ 31; Contract 7).[3] Ms. Pui Lam's company, Bright Range Limited, signed on Plaintiff's behalf as the Trustor. (SAC ¶ 32; Contract 3).[4] Zhiran "Marc" Cheng, a purported associate of Mr. Xin, signed as Trustee on IvyMountain International's behalf and listed his title as "Secretary of the Board of Directors." (SAC ¶ 35; *see* Contract 3, 7).

The Contract required that the Trustor pay a $250,000 service fee to the Trustee, IvyMountain International, in exchange for "professional study abroad intermediary services." (Contract 3, 5). It also enumerated seven "target schools" to which the Trustee would apply on behalf of the Trustor, five of which were considered "reach" schools. (*Id.* at 3). The reach schools were identified as Harvard University, Yale University, Columbia University, Cornell University, and Princeton University. (*Id.*; SAC ¶ 33). If the Trustee was "unable to help the Trustor gain acceptance to any of these reach schools," the Trustee would have to refund half of the service fee, or $125,000, to the Trustor "within one business day." (Contract 3). The Contract required the Trustor to provide "legal, factual, and valid" background materials and documents, including a CV, required for the applications. (*Id.* at 4-5). Otherwise, the Trustee could terminate the contract. (*Id.* at 4). The Contract also required the

---

3 Defendants include an alternate translation of the Contract as an exhibit to their memorandum of law in support of their motion to dismiss, but because a motion to dismiss is before the Court, the Court considers only the Plaintiff's version, which is incorporated by reference in the SAC. (*See* SAC ¶ 31). *Cf. DiFolco*, 622 F.3d at 111 (explaining that on a motion to dismiss, courts may only consider documents incorporated by reference and documents integral to a complaint).

4 Though Plaintiff's daughter is not a signatory to the Contract, the Court understands that she is the intended beneficiary of the parties' conduct under the Contract, including in particular the submission of college applications. (*See* SAC ¶ 26).

Trustor to "confirm[] the schools that will be applied to as stipulated in the Contract[.]" (*Id.*). Finally, the Contract required that any "addendums, changes, and revisions ... be completed in writing as a supplementary contract." (*Id.* at 7).

On February 6, 2023, at 1:05 p.m., Plaintiff wired $250,000 to Mr. Xin's personal bank account at Chase Bank in New York. (SAC ¶ 37). Mr. Xin represented to Plaintiff that "the money should be wired to him personally because IvyMountain had a lot of clients and a lot of money was being wired into its bank account." (*Id.* ¶ 36). Plaintiff alleges that this proffered justification was false and that, in reality, Mr. Xin intended only "to cover-up the fact that IvyMountain, LLC was not a real company and could not get a U.S. bank account." (*Id.*). Plaintiff insists that Mr. Xin "intended to simply pocket [his] money," which Plaintiff never would have wired had Mr. Xin told him the truth. (*Id.* ¶¶ 36-38).

According to Plaintiff, "pocket[ing] [his] money" is precisely what Mr. Xin did. (SAC ¶¶ 36, 38). After the wire transfer, neither Mr. Xin nor China Summit Capital, nor the allegedly fictitious IvyMountain International, "did anything to help [Plaintiff's] daughter gain admission into any of the target schools identified in the Contract." (*Id.* ¶ 39). Instead, Mr. Xin kept Plaintiff's money and shared a portion thereof with Mr. Cheng. (*Id.*). Meanwhile, Plaintiff's daughter was not admitted to any of the reach schools, and Plaintiff thus requested that Defendants return $125,000, or half of the money that he had wired them. (*Id.* ¶¶ 45, 47). Defendants rebuffed the request. (*Id.* ¶ 47).

**4. Other Victims of Mr. Xin's Alleged Scheme**

In the SAC, Plaintiff identifies for the first time Sherry Shan, another purported victim of Defendants' alleged scheme. (SAC ¶ 40). Ms. Shan, like Plaintiff, discovered Mr. Xin and China Summit Capital through Ms. Pui Lam. (*Id.*). Ms. Shan and Mr. Xin then exchanged messages through WeChat, in the course of which Mr. Xin represented "that IvyMountain had extensive staff, connections, and expertise for helping Chinese students ... gain admission into the top U.S. colleges and could provide 'study-abroad lobby' services to help her son gain admission into Cornell for the Fall of 2023." (*Id.*). As a result, on January 19, 2023, Ms. Shan and Mr. Xin entered into an oral contract for "'study abroad lobby' services." (*Id.* ¶ 42). Ms. Shan made two wire transfers to Mr. Xin pursuant to that agreement: one wire of RMB 60,000 (roughly $8,844 at the time of the SAC, according to Plaintiff) on January 23, 2023, and another wire of RMB 695,000 (roughly $102,860, according to Plaintiff), on January 31, 2023. (*Id.* ¶ 43).

According to Plaintiff, neither Mr. Xin, China Summit Capital, nor IvyMountain International "provided any of the 'study abroad lobby' services" that Mr. Xin had promised to Ms. Shan. (SAC ¶ 44). Ms. Shan's son was not admitted to Cornell University (*id.* ¶ 46), and when Ms. Shan demanded a refund, Mr. Xin refused (*id.* ¶ 49). Plaintiff alleges that "Defendants have engaged in the same wire fraud scheme as to many other victims" and that the scheme "continues to this day." (*Id.* ¶ 71).

**5. Anonymous Threats to Plaintiff**

Several anonymous threats have complicated the course of this litigation. Plaintiff alleges that Mr. Xin made various threats to Plaintiff and Ms. Pui Lam involving Plaintiff's daughter and others. (*See* SAC ¶¶ 72, 74, 79, 81). Specifically, Plaintiff claims that Mr. Xin threatened to "improperly influence U.S. immigration officials in retaliation for the Plaintiff or other class members seeking return of their money" (*id.* ¶ 72); that Mr. Xin sent Plaintiff a message on February 15, 2024, that "indicat[ed] that [Plaintiff's] daughter was in immediate physical danger due to Plaintiff's filing of this case" (*id.* ¶ 74); and that Mr. Xin sent Plaintiff another message on February 18, 2025, "threatening that his daughter would be harmed if he continued prosecuting this case" (*id.* ¶ 79). Plaintiff also alleges that Mr. Xin sent a message through a "burner account" to Ms. Pui Lam on August 22, 2025, threatening: "if you keep looking for trouble, kill your son in Manhattan home." (*Id.* ¶ 81).

More details of the threats are recounted in sealed filings, and the Court will not disturb the confidentiality of those documents. Suffice it to say, from the public record, that Plaintiff draws various inferences to arrive at the conclusion that Mr. Xin must have been responsible for each threat. (*See, e.g.,* SAC ¶¶ 79, 81-82).

**6. Plaintiff's Class Allegations**

Plaintiff has not yet moved to certify a class, but he alleges that he will represent a class of "[a]ll individuals who entered into educational consulting contracts with IvyMountain, LLC, MeiTeng International Education, Qi Xin,

China Summit Capital, or paid education consulting fees to IvyMountain, LLC, MeiTeng International Education, Qi Xin and/or China Summit Capital" and, alternatively or concurrently, a subclass defined as follows:

> [a]ll individuals [i] who entered into education consulting contracts with IvyMountain, LLC, MeiTeng International Education, Qi Xin, and/or China Summit Capital; [ii] whose children did not gain admission to one or more of the target schools enumerated therein; but [iii] whose money IvyMountain, LLC, MeiTeng International Education, Qi Xin and/or China Summit Capital refused to refund.

(SAC ¶¶ 50-51).

Plaintiff alleges that members of the class are so numerous that joinder is impracticable; that all or nearly all of the class members are based in China; and that the exact number of members can be determined by a review of Defendants' records. (SAC ¶¶ 53, 56). He identifies several common questions of law and fact, including whether Defendants' representations about IvyMountain International are false, whether IvyMountain is an enterprise in the civil RICO context, and whether Mr. Xin fraudulently induced Plaintiff and other members of the proposed class to enter into their respective contracts. (*Id.* ¶ 55). Plaintiff also alleges that he will adequately represent other class members because he and his counsel have no interest adverse to the other class members and because his counsel has substantial experience in handling class actions and other complex matters. (*Id.* ¶ 57). Finally, according to Plaintiff, a class action would be superior to multiple individual actions here because it would promote consistency and conserve judicial resources. (*Id.* ¶ 56).

**B. Procedural Background**

On November 6, 2023, Plaintiff initiated the instant action by filing his original complaint, in which Plaintiff (i) sought to represent a class and (ii) asserted claims for violations of RICO and the New York Consumer Protection Act (Counts I and III), fraud (Count II), negligent misrepresentation (Count IV), breach of contract (Count V), and unjust enrichment (Count VI). (Dkt. #1 ("Compl.") ¶¶ 48-81).

On March 10, 2024, after being granted several extensions, Defendants filed their Answer. (Dkt. #42). In their Answer, Defendants asserted counterclaims for defamation and "[h]arassment and [i]nsulting Mr. Qi[.]" (*Id.* at 20-21). On March 11, 2024, Defendants filed a motion to strike the class action allegations and to dismiss all counts in the complaint. (Dkt. #44-45). Despite the Defendants' failure to file a pre-motion submission in anticipation of moving to dismiss the action in accordance with Rule 4(a) of the Court's Individual Rules, the Court nonetheless waived the pre-motion submission requirement and set a briefing schedule. (Dkt. #46).

On April 5, 2024, Plaintiff filed a pre-motion letter stating his intention to file a motion to dismiss Defendants' counterclaims. (Dkt. #49). The Court permitted Plaintiff to file a motion to dismiss the counterclaims and amended the briefing schedule accordingly. (Dkt. #50). On April 29, 2024, Plaintiff filed his joint memorandum of law in opposition to Defendants' motion to dismiss and in support of his motion to dismiss Defendants' counterclaims. (Dkt. #52). Defendants filed their joint opposition to Plaintiff's motion to dismiss and reply

in further support of their motion to dismiss on May 12, 2024. (Dkt. #53). On May 28, 2024, Plaintiff filed a joint reply in support of his motion and sur-reply in further opposition to Defendants' motion (Dkt. #56), which concluded briefing on the first round of motions.

On January 31, 2025, the Court granted in part and denied in part Defendants' motion to strike the class action allegations and dismiss Plaintiff's Complaint. (Dkt. #60 (order)). In an oral decision, the Court dismissed Counts I (violation of civil RICO), II (fraud), and IV (negligent misrepresentation) with leave to amend, and dismissed Count VI (unjust enrichment) and the rescission claim in Count V (breach of contract) with prejudice. (*Id.*). The Court denied Defendants' motion to strike Plaintiff's class claims without prejudice to its renewal at the class certification stage and denied their motion to dismiss Count III (violation of New York General Business Law § 349) and Count V (breach of contract) except for the rescission claim therein. (*Id.*).

The Court also granted Plaintiff's motion to dismiss Defendants' counterclaims. (Dkt. #60). It dismissed Defendants' defamation counterclaim with leave to amend and dismissed their harassing and insulting counterclaim with prejudice. (*Id.*).

In the meantime, upon submission of information surrounding anonymous threats (Dkt. #62), the Court held a telephonic conference on February 28, 2025 (February 28, 2025 Minute Entry). That conference resolved the issue to the Court's satisfaction, and the Court also denied each side's motion for sanctions. (*Id.*).

On March 14, 2025, Plaintiff filed his First Amended Complaint (the "FAC"). (Dkt. #67). After again receiving multiple extensions from the Court (Dkt. #70), Defendants filed an Answer to the FAC and a counterclaim on April 3, 2025 (Dkt. #71). Plaintiff responded with an Answer to the counterclaim on April 18, 2025. (Dkt. #72).

On July 17, 2025, Plaintiff's counsel filed a letter motion for a conference that sought in part to set a deadline for Defendants to respond to Plaintiff's first set of requests for production. (Dkt. #73). While these requests were issued on February 24, 2024, the Court had stayed discovery pending the resolution of the first motion to dismiss (Dkt. #58). After the Court granted Plaintiff's request for a conference (Dkt. #74), Defendants, in turn, asked the Court to dismiss the case for lack of subject matter jurisdiction (Dkt. #75). The Court addressed these issues at a conference on August 20, 2025, and set a briefing schedule for Defendants' anticipated motion to dismiss, including an opportunity for Plaintiff to amend his complaint again. (August 20, 2025 Minute Entry).

Plaintiff filed the SAC on September 29, 2025. (Dkt. #80). Because Defendants filed separate motions to dismiss for lack of jurisdiction and "to [d]ismiss [the] [c]ase as [f]rivolous," as well as an Answer despite their intent to file a motion to dismiss (Dkt. #81-84), the Court denied the motions without prejudice and requested clarification from Defendants on whether they intended to answer the SAC or dismiss it (Dkt. #85). After one more cycle of confused filings and the Court's request for clarification (*see* Dkt. #86-88),

Defendants filed notice of the instant motion to dismiss and a memorandum of law in support thereof (Dkt. #89-90). Plaintiff, upon being granted an extension, filed his opposition on December 12, 2025. (Dkt. #94). Defendants filed their reply brief on December 24, 2025. (Dkt. #95).

## DISCUSSION

### A. The Court Cannot Dismiss Plaintiff's Claims on Rule 12(b)(1) Grounds

#### 1. Applicable Law for Rule 12(b)(1)

Defendants begin by challenging the Court's jurisdiction to hear the matter in the first instance. (Def. Br. 2, 5-7). Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *see also Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010). A plaintiff carries the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *See, e.g., Branch of Citibank, N.A.* v. *De Nevares*, 74 F.4th 8, 15 (2d Cir. 2023).

The Second Circuit has identified two types of Rule 12(b)(1) motions: facial and fact-based. *See Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016); *see also Katz* v. *Donna Karan Co.*, 872 F.3d 114, 119 (2d Cir.

2017). A facial Rule 12(b)(1) motion is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Carter*, 822 F.3d at 56. A plaintiff opposing such a motion bears "no evidentiary burden." *Id.* Instead, to resolve a facial Rule 12(b)(1) motion, a district court must "determine whether [the complaint and its exhibits] allege[] facts that" establish subject matter jurisdiction. *Id.* (quoting *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (internal quotation marks omitted) (per curiam)). And, in making that determination, a court must accept the complaint's allegations as true "and draw[] all reasonable inferences in favor of the plaintiff." *Id.* at 57 (internal quotation marks and citation omitted).

"Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the complaint and its exhibits." *Carter*, 822 F.3d at 57; *see also MMA Consultants 1, Inc.* v. *Rep. of Peru*, 719 F. App'x 47, 49 (2d Cir. 2017) (summary order) (defining fact-based Rule 12(b)(1) motion as one where "the defendant puts forward evidence to challenge the factual contentions underlying the plaintiff's assertion of subject-matter jurisdiction"). "In opposition to such a motion, [a plaintiff] must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz*, 872 F.3d at 119 (internal citations and quotation marks omitted). If a defendant supports a fact-based Rule 12(b)(1) motion with "material and controverted" "extrinsic

evidence," a "district court will need to make findings of fact in aid of its decision as to [subject matter jurisdiction]." *Carter*, 822 F.3d at 57.

### 2. Analysis

#### a. The Court Has Federal Question Jurisdiction over the Civil RICO Claim

Defendants insist that the Court has no subject matter jurisdiction — namely, that the Court lacks federal question jurisdiction, diversity jurisdiction, and jurisdiction under the Class Action Fairness Act ("CAFA"), Pub. L. 109-2, 119 Stat. 4-14 (2005). (Def. Br. 2-3).[5] The Court disagrees, as it finds that it has federal question jurisdiction to hear Plaintiff's civil RICO claim and that, accordingly, it has discretion to exercise supplemental jurisdiction over Plaintiff's state-law claims. Nevertheless, the Court finds that there is no diversity jurisdiction or jurisdiction conferred by CAFA.

Under 28 U.S.C. § 1331, district courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Indeed, federal question jurisdiction provides an independent basis for this Court to exercise subject matter jurisdiction over civil RICO claims. *See Air China, Ltd.* v. *Kopf*, 473 F. App'x 45, 47-48 (2d Cir. 2012) (summary order) (citing 28 U.S.C. § 1331). The RICO statute makes that clear, stating that

---

5 Defendants also summarily raise an objection to this Court's exercise of personal jurisdiction. (*See* Def. Br. 4). While Defendants may not have intended to waive this argument, the Court considers it forfeited to the extent that Defendants seek to prevail without making any argument in support of their conclusory statement. *See United States* v. *Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs."); *City of Syracuse* v. *Onondaga Cnty.*, 464 F.3d 297, 308 (2d Cir. 2006) (citing *Norton* v. *Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived[.]")).

"[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c).

Defendants contend that the Court lacks federal question jurisdiction by launching into arguments regarding the merits of the civil RICO claim. (*See* Def. Br. 5-6). Such discussion, however, is premature because the Court's subject matter jurisdiction to hear the civil RICO claim is distinct from the merits of the claim itself. To be sure, the merits are not *entirely* irrelevant to the jurisdictional question. In the Second Circuit, courts analyzing federal question jurisdiction consider whether "'the cause of action alleged is *so patently without merit* as to justify … the court's dismissal for want of jurisdiction.'" *Town of West Hartford* v. *Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990) (quoting *Hagans* v. *Lavine*, 415 U.S. 528, 542-543 (1974)). Here, though the Court determines that Plaintiff's civil RICO claim ultimately fails on the merits, Plaintiff has alleged his claim sufficiently to meet the low bar for federal question jurisdiction. In particular, as the Court explores later on, Plaintiff has successfully alleged at least some elements of a civil RICO claim. In addition, because the Court has federal question jurisdiction, it may exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

Because the Court's finding of federal question jurisdiction disposes of the subject matter jurisdiction issue, the Court will only briefly discuss

diversity jurisdiction and CAFA, each of which could potentially supply an alternate basis for subject matter jurisdiction but neither of which is satisfied in this case.

*First*, diversity jurisdiction is not met. In the SAC, Plaintiff alleges that he is a foreign citizen and that Defendant is a permanent resident in the process of applying for U.S. citizenship. (SAC ¶ 2). In other words, there are "aliens on two sides of [the] case," which "destroys diversity jurisdiction." *Suedrohrbau Saudi Co.* v. *Bazzi*, No. 21-2307-cv, 2023 WL 1807717, at *2 (2d Cir. Feb. 8, 2023) (summary order) (internal quotation marks omitted) (quoting *Corporacion Venezolana de Fomento* v. *Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir. 1980)); *see also Zhang* v. *Han*, No. 21 Civ. 1625 (GHW), 2022 WL 62154, at *2 (S.D.N.Y. Jan. 5, 2022) ("A foreign citizen who is a permanent resident of the United States is 'an alien for the purposes of diversity jurisdiction.'" (quoting *Tagger* v. *Strauss Grp. Ltd.*, 951 F.3d 124, 126 (2d Cir. 2020))).

*Second*, CAFA does not confer subject matter jurisdiction on the Court. CAFA requires that (i) at least one plaintiff and one defendant are citizens of different states; (ii) the putative class contains at least 100 members; and (iii) the amount in controversy exceeds $5 million in the aggregate, not including interest or costs. 28 U.S.C. § 1332(d)(2), (5); *see also Blockbuster, Inc.* v. *Galeno*, 472 F.3d 53, 56 (2d Cir. 2006). Plaintiff has not sufficiently alleged that minimal diversity is met and indeed acknowledges that "all — or nearly all — of the Class are based in China and weary of availing themselves

of the U.S. legal system." (SAC ¶ 56). *See Cosgrove* v. *Oregon Chai, Inc.*, 520 F. Supp 3d 562, 572 (S.D.N.Y. 2021) (explaining that CAFA "requires that (i) at least one plaintiff and one defendant are citizens of different states" (citing 28 U.S.C. § 1332(d))). Because Plaintiff alleges that Defendant is not yet a U.S. citizen, and his pleadings suggest strongly that the proposed class contains no U.S. citizens (except for a single conclusory statement reciting some elements of CAFA (SAC ¶ 13)), Plaintiff cannot meet this prong. Plaintiff also provides no numerical estimate of the class and no reason for the Court to assume that it contains at least 100 members. *See* 28 U.S.C. § 1332(d)(5) (providing that "the number of members of all proposed plaintiff classes in the aggregate" must be at least 100). (*See generally* SAC). Finally, Plaintiff's conclusory statement that the amount in controversy exceeds $5 million provides no basis for an inference the Court may draw in Plaintiff's favor. (*See* SAC ¶ 13). And because he can identify only one other member of the class (though he insists there must be more), and the amount in controversy for Plaintiff and Ms. Shan collectively rests well under half a million dollars, there is no "reasonable probability" that the amount in controversy meets the threshold. *Blockbuster, Inc.*, 472 F.3d at 58; *see* 28 U.S.C. § 1332(d)(6) (requiring the amount of controversy to exceed "the sum or value of $5,000,000").

**B. The Court Dismisses Plaintiff's Claims on Rule 12(b)(6) Grounds**

**1. Applicable Law for Rule 12(b)(6)**

Defendants seek dismissal of Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

When considering such a motion, a court should "draw all reasonable inferences in [the p]laintiff's favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" (alteration in original) (quoting *Twombly*, 550 U.S. at 570)).

A court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting *Smith* v. *Loc. 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" (second alteration in original) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009))).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents

incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

**2. Analysis**

Congress enacted RICO in 1970 to "eradicat[e] ... organized crime in the United States." *Am. Fed'n of State, Cnty. and Mun. Emps. Dist. Council 37 Health & Sec. Plan* v. *Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 344 (S.D.N.Y. 2013) (citing Pub. L. No. 91-452 (1970)). Under RICO, "it is 'unlawful for any person employed or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.'" *Id.* (quoting 18 U.S.C. § 1962(c)). The statute defines racketeering activity as "encompass[ing] dozens of state and federal offenses" that serve as punishable predicate acts. *RJR Nabisco, Inc.* v. *European Cmty.*, 579 U.S. 325, 329-30 (2016). A "pattern of racketeering activity" occurs when "an individual commits two or more predicate offenses within a ten-year period; those predicate offenses are related to one another; and the predicates 'amount to or pose a threat of continued criminal activity[.]'" *Elsevier Inc.* v. *Grossmann*, No. 12 Civ. 5121 (KPF), 2017 WL 1843298, at *3 (S.D.N.Y. May 8, 2017) ("*Elsevier II*") (internal quotation marks and citations omitted) (quoting *H.J. Inc.* v. *Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

As relevant to this case, RICO affords a private right of action to individuals who are injured by the pattern of racketeering activity. *See* 18 U.S.C. § 1964(c). This private right of action allows "[a]ny person injured in his business or property by reason of a violation of section 1962" to bring suit under Section 1964 and "recover threefold the damages [it] sustains and the cost of the suit, including a reasonable attorney's fee[.]" *Id.* § 1964(c).

Here, Defendants argue that Plaintiff fails to state a claim for civil RICO because Plaintiff has not sufficiently pleaded (i) an enterprise or (ii) a pattern of racketeering activity. (Def. Br. 5-7). This Court agrees.

**a. Plaintiff Fails to Allege an Enterprise**

The RICO statute defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and *any union or group of individuals associated in fact although not a legal entity*." 18 U.S.C. § 1961(4) (emphasis added). An enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct" and often "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States* v. *Turkette*, 452 U.S. 576, 583 (1981); *see also Elsevier, Inc.* v. *Grossman*, No. 12 Civ. 5121 (KPF), 2013 WL 6331839, at *8 (S.D.N.Y. Dec. 5, 2013) ("*Elsevier I*"). For an association to be considered an enterprise in fact, its structure must include: "(i) a purpose; (ii) relationships among the individuals associated with the enterprise; and (iii) longevity sufficient to permit

the associates to pursue the purpose of the enterprise." *Elsevier I*, 2013 WL 6331839, at *8.

Plaintiff claims that there was an enterprise in fact that included Defendants Mr. Xin (as mastermind and beneficiary) and China Summit Capital (marketing vehicle), Mr. Cheng (signatory and enforcer), and "recruited intermediaries" such as Bright Range Limited and Ms. Pui Lam. (SAC ¶¶ 64-65). The Court concludes that there was no enterprise in fact.[6] It analyzes each element in turn.

*First,* Plaintiff has adequately stated that the alleged enterprise, if it exists, has the purpose of defrauding victims through the false pretense of offering college consulting services. He spells out this purpose explicitly in the SAC, alleging that Defendants' aim was "to deceive victims … into paying Mr. Xin, Mr. Cheng, and other co-conspirators hundreds of thousands of dollars based on the false promise that IvyMountain's staff of admissions experts would assist in securing admission to elite U.S. colleges." (SAC ¶ 63).

*Second*, and significantly, the relationships Plaintiff pleads are not sufficient to state a civil RICO claim. Plaintiff alleges:

[6] In their respective briefs, Plaintiff and Defendants also discuss at length whether Plaintiff has adequately pleaded a distinct RICO "person" and "enterprise." (*See* Def. Br. 5-7; Pl. Opp. 2-4). RICO provides that it is unlawful for a "person" who is "employed by or associated with" an "enterprise" to conduct the enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). Thus, to recover damages under 18 U.S.C. § 1964, a plaintiff must "prove the existence of two distinct entities: [i] a 'person'; and [ii] an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd.* v. *King*, 533 U.S. 158, 161 (2001); *accord First Cap. Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004). Because the Court concludes there was no enterprise in fact, it need not address the distinctiveness requirement.

> Mr. Xin, Marc Cheng, China Summit Capital, and their recruited intermediaries (including Bright Range Limited and Ms. Chu Pui Lam) all participated in the operation and management of the RICO Enterprise. Each played a distinct role essential to the Enterprise's functioning: Xin as mastermind and beneficiary, Cheng as signatory and enforcer, China Summit Capital as marketing vehicle, and intermediaries as recruiters and conduits for communications with victims.

(SAC ¶ 65).

Recall Plaintiff's discussion of Ms. Pui Lam's and Mr. Cheng's involvement. He alleges that Ms. Pui Lam, then an intermediary and his broker, had discussions with Mr. Xin on WeChat and WhatsApp in which "Mr. Xin represented to Ms. Pui Lam that Ivy Mountain International had extensive staff, connections, and expertise for helping students gain admission into the top U.S. colleges." (SAC ¶ 23). Ms. Pui Lam relayed that information to Plaintiff. (*Id.* ¶ 24). She "also introduced another victim, Sherry Shan, to Qi Xin." (*Id.* ¶ 40). Mr. Cheng, meanwhile, has held himself out variously as "Secretary of the Board of Directors" for IvyMountain (*id.* ¶ 35) and "the person in charge of [IvyMountain]" (*id.* ¶ 65(c)) as well as signed the contract with Plaintiff on IvyMountain's behalf (*id.* ¶ 35). Mr. Cheng also directed Plaintiff's counsel to direct lawsuits at him and "not [to] involve others." (*Id.* ¶ 65(c)).

Try as he might, Plaintiff fails to plausibly connect these intermediaries to specific roles and to each other in a manner that reflects "the 'hierarchy, organization, and activities' of this alleged association-in-fact enterprise" such that the Court "could fairly conclude that its 'members functioned as a unit.'" *First Cap. Asset Mgmt., Inc.*, v. *Satinwood, Inc.*, 385 F.3d 159, 174-75 (2d Cir.

2004) (quoting *Nasik Breeding & Rsch. Farm Ltd.* v. *Merck & Co.*, 156 F. Supp. 2d 514, 539 (S.D.N.Y. 2001)). For one, he fails to plausibly allege that Ms. Pui Lam (or her business, Bright Range Limited), acting as Plaintiff's own intermediary, was associated with Mr. Xin in any meaningful sense — let alone that she acted knowingly in furtherance of the alleged fraud against Plaintiff or Ms. Shan. Ms. Pui Lam and Bright Range Limited were thus not "recruited intermediaries" for Mr. Xin within any reasonable meaning of that term. (*Id.* ¶ 65). As for Mr. Cheng, while Plaintiff fairly identifies him as an "associate" of Mr. Xin, Plaintiff's pleadings show only that Mr. Cheng participated in making one contract with Plaintiff, not that Mr. Cheng acted as "signatory" or "enforcer" in dealings with anyone besides Plaintiff, including the single other alleged victim mentioned in the SAC. (*Id.*).

*Third*, Plaintiff's pleadings also fail to meet the longevity prong. As in earlier iterations of the Complaint, Plaintiff fails to clearly allege the period during which the purported enterprise in fact operated. To be sure, he provides more dates in this filing than in previous ones: He explains that his daughter was applying for college admission "[i]n late 2022/early 2023"; that the series of relevant communications between the parties occurred leading up to a February 6, 2023 contract signing; and that Plaintiff executed the wire transfer to Mr. Xin on that afternoon. (SAC ¶¶ 21, 23-26, 37). He also details alleged witness tampering that occurred vis-à-vis an anonymous threat on August 22, 2025. (*Id.* ¶ 81). While this specificity is an improvement over past filings, the SAC is still insufficiently specific to plausibly allege longevity. For

example, Plaintiff notes that Mr. Xin suddenly took down a portion of China Summit Capital's website that advertised education consulting services upon the filing of this lawsuit in November 2023 (*id.* ¶¶ 17 n.2, 67), but he provides scant details as to how long the webpage was operative, how the Defendants currently market IvyMountain services, or who may have been harmed before or after his and Ms. Shan's experiences with IvyMountain International. In short, Plaintiff still does not clearly allege the period that the purported enterprise in fact operated.

Plaintiff's failure to plead an enterprise in fact on its own defeats his civil RICO claim. The Court will nonetheless analyze Plaintiff's allegations regarding the pattern of racketeering activity for completeness.

**b. Plaintiff Fails to Allege a Pattern of Racketeering Activity**

Even if Plaintiff had sufficiently pleaded an enterprise in fact, he has not sufficiently pleaded a pattern of racketeering activity. Racketeering activity "may consist of any of a number of criminal offenses, ... including ... wire fraud in violation of 18 U.S.C. § 1343." *Crawford* v. *Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014) (citing 18 U.S.C. § 1961(1)). "A 'pattern of racketeering activity' consists of, *inter alia*, 'at least two acts of racketeering activity[.]'" *Id.* (quoting 18 U.S.C. § 1961(5)). "To survive a motion to dismiss, this pattern must be adequately alleged in the complaint." *BWP Media USA Inc.* v. *Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 361 (S.D.N.Y. 2014) (quoting *Spool* v. *World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008)).

Further, "a civil RICO plaintiff also 'must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity[.]'" *Crawford*, 758 F.3d at 487 (quoting *H.J.*, 492 U.S. at 239). "The requisite continuity may be found in either an open-ended pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (*i.e.*, past criminal conduct extending over a substantial period of time)." *Id.* (internal quotation marks omitted) (quoting *GICC Cap. Corp.* v. *Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995)).

In this case, Plaintiff alleges several predicate acts of wire fraud in violation of 18 U.S.C. § 1343 as well as threats in violation of 18 U.S.C. §§ 875, 1951, 1512, and 1513, the first of which could not constitute a predicate act under 18 U.S.C. § 1961. (*See* SAC ¶¶ 69-70, 74, 79, 83). And while he has alleged sufficient predicate acts, he has not adequately pleaded continuity.

**i. Plaintiff Has Sufficiently Pleaded Two or More Predicate Acts**

Plaintiff has adequately alleged multiple predicate acts. "[W]here … the predicate acts on which a RICO claim is based sound in fraud, those acts must be pleaded in conformity with [Federal] Rule [of Civil Procedure] 9(b)'s heightened pleading standard." *BWP Media USA Inc.*, 69 F. Supp. 3d at 362 (alteration adopted) (quoting *Cont'l Petrol. Corp.* v. *Corp. Funding Partners, LLC*, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *4 (S.D.N.Y. Apr. 12, 2012)). "In order to comply with Rule 9(b), a complaint alleging fraud 'must: [i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker,

[iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent.'" *Id.* (quoting *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)). "And 'when ... a complaint contains allegations of fraud against multiple defendants, the plaintiff must plead facts that describe each defendant's involvement in the fraud.'" *Id.* (alteration adopted) (quoting *Watkins* v. *Smith*, No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *9 (S.D.N.Y. Feb. 22, 2013)).

The Second Circuit has cautioned that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford*, 758 F.3d at 489 (internal quotation marks omitted) (quoting *Efron* v. *Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)). Indeed, "civil RICO is an unusually potent weapon — the litigation equivalent of a thermonuclear device" — and "the mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants[.]" *Gruber* v. *Gilbertson*, No. 16 Civ. 9727 (WHP), 2019 WL 4458956, at *5 (S.D.N.Y. Sept. 17, 2019) (alteration adopted) (quoting *Katzman* v. *Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996)). Accordingly, courts "express skepticism toward civil RICO claims," and "plaintiffs wielding RICO almost always miss the mark." *Id.* (internal quotation marks and citation omitted and alteration adopted) (quoting *Flexborrow LLC* v. *TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017)); *see also Gross* v. *Waywell*, 628 F. Supp. 2d 475, 479-83 (S.D.N.Y. 2009) (surveying civil RICO

cases and finding that they overwhelmingly fail and that "RICO's enchantment, like the siren's song, has again drawn another crew of spellbound plaintiffs foundering against the rocks").

Here, the Court construes Plaintiff's allegations as pleading seven acts of wire fraud in violation of 18 U.S.C. § 1343, at least some of which may be sufficient predicate acts. (*See* SAC ¶¶ 69-71). The elements of wire fraud are "[i] the use of interstate wires in furtherance of [ii] a scheme to defraud [iii] with money or property as the object." *Maersk, Inc.* v. *Neewra, Inc.*, 687 F. Supp. 2d 300, 332 (S.D.N.Y. 2009), *aff'd sub nom.*, *Maersk, Inc.* v. *Sahni*, 450 F. App'x 3 (2d Cir. 2011) (summary order). As stated before, wire fraud allegations are subject to the heightened pleading standards of Rule 9(b). *Elsevier I*, 2013 WL 6331839, at *9. Accordingly, to allege wire fraud with sufficient particularity, Plaintiff must specify the "content, time, place, and speaker of each alleged mailing or wire transmission." *Id.* (internal quotation marks omitted) (quoting *Bologna* v. *Allstate Ins. Co.*, 138 F. Supp. 2d 310, 321 (E.D.N.Y. 2001)). But in cases where "mails or wires were simply used in furtherance of a master plan to defraud" but did not themselves "contain[] false or misleading information," "Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

Plaintiff's claims of wire fraud can be sorted into two buckets: wires that themselves "contained false or misleading information," *In re Sumitomo Copper*

*Litig.*, 995 F. Supp. at 456, for which Plaintiff must accordingly plead the "content, time, place, and speaker" thereof, *Elsevier I*, 2013 WL 6331839, at *9 (quoting *Bologna*, 138 F. Supp. 2d at 321), and wires that contained no such information but "were simply used in furtherance of a master plan to defraud," *In re Sumitomo Copper Litig.*, 995 F. Supp. at 456. The Court construes Plaintiff's pleadings to raise four wires in the first bucket and three in the second. And Plaintiff adequately alleges some wires in each bucket.

With respect to the first bucket, Plaintiff describes various communications between Mr. Xin and himself, Ms. Pui Lam, and Ms. Shan, in which Mr. Xin made fraudulent representations about IvyMountain International to induce payments. (*See* SAC ¶¶ 23, 26, 40). He also claims that he accessed China Summit Capital's website "[i]n late January and/or early February 2023" (*id.* ¶ 25), and that China Summit Capital for a period of time marketed on its site a "guaranteed admission plan," boasting that "IvyMountain International had assembled an elite team of admissions officers from the Top 30 most prestigious schools in the United States" (*id.* ¶¶ 17 n.2, 19, 25).

Plaintiff adequately pleads only Mr. Xin's communications with Ms. Shan on January 19, 2023, as constitutive of wire fraud. (*See* SAC ¶¶ 40, 70). Of the three discrete sets of "communications" Plaintiff recounts, he provides a specific date and a (brief) direct quote for only that set, despite this Court's clear explication of the Rule 9(b) standard in resolving the first motion to dismiss. (*See id.* ¶¶ 23, 26, 40; *see also* Dkt. #60). *See Kalimantano GmbH* v.

*Motion in Time, Inc.*, 939 F. Supp. 2d 392, 413 (S.D.N.Y. 2013) (determining that the plaintiff's allegations were not sufficiently specific in part because of the lack of direct quotation and failure to provide exact dates). Plaintiff's claim regarding accessing the website fails for similar reasons. True, "[t]he primary purpose of Rule 9(b)'s heightened pleading requirements is to 'afford defendant[s] fair notice of the plaintiff's claim and the factual ground upon which it is based.'" *Lee* v. *Jarecki*, No. 18 Civ. 9400 (CM), 2019 WL 948881, at *5 (S.D.N.Y. Feb. 14, 2019) (quoting *Ross* v. *Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)). But without a specific date, more quotations, or other proof from the website, the Court has no assurance that the contents of the website remained unchanged throughout the period of time Plaintiff provides, especially given that the website is no longer available.

In addition to the one set of communications in the first bucket that Plaintiff alleges with requisite particularity, he has also sufficiently pleaded three wires in the second bucket: a $250,000 wire from himself to Mr. Xin on February 6, 2023, at 1:05 p.m. (SAC ¶ 37), as well as two wires from Mr. Shan to Mr. Xin, in the amount of RMB 60,000 and RMB 695,000, on January 23, 2023, and January 31, 2023, respectively (*id.* ¶ 43). These wires alone, alongside Plaintiff's description of "the specific circumstances constituting the overall fraudulent scheme," constitute three predicate acts. *In re Sumitomo Copper Litig.*, 995 F. Supp. at 456.

Plaintiff also alleges that Mr. Xin committed predicate acts in the form of several anonymous threats regarding Plaintiff's daughter and others. (*See* SAC

¶¶ 72, 74, 79, 81). As explained above, Plaintiff claims that Mr. Xin threatened to "improperly influence U.S. immigration officials in retaliation for the Plaintiff or other class members seeking return of their money" (*id.* ¶ 72); that Mr. Xin sent Plaintiff a message on February 15, 2024, that "indicat[ed] that [Plaintiff's] daughter was in immediate physical danger due to Plaintiff's filing of the case" (*id.* ¶ 74); and that Mr. Xin sent Plaintiff another message on February 18, 2025, "threatening that his daughter would be harmed if he continued prosecuting this case" (*id.* ¶ 79). Plaintiff argues that the threats "constituted a violation of both 18 U.S.C. § 875 and 18 U.S.C. § 1951 and [were] act[s] of racketeering activity in furtherance of the RICO enterprise." (*Id.* ¶¶ 74, 79). In addition, he alleges that Mr. Xin sent a message through a "burner account" to Ms. Pui Lam on August 22, 2025, threatening: "if you keep looking for trouble, kill your son in Manhattan home." (*Id.* ¶ 81). According to Plaintiff, this threat against Ms. Pui Lam's son runs afoul of 18 U.S.C. § 1512 and 18 U.S.C. § 1513, both of which define predicate acts. (*Id.* ¶ 83).

The problem for Plaintiff is that Section 875 is not a civil RICO predicate at all, *see* 18 U.S.C. § 1961(1) (listing predicate acts), and Section 1951 simply does not fit these facts. There is no evidence that the alleged threats against Plaintiff, even if they came from Mr. Xin, had any impact on or were attempts to impact "commerce or the movement of any article or commodity in commerce, by robbery or extortion[.]" 18 U.S.C. § 1951(a). Indeed, each threat occurred well after the transfer of funds. (*See* SAC ¶¶ 37, 43, 72, 74, 79, 81).

As for the threat against Ms. Pui Lam's son, Plaintiff does plead circumstances that make it plausible for Mr. Xin to have sent the threat, and the Court may draw inferences that the threat was made to "influence, delay, or prevent the testimony" of Ms. Pui Lam. 18 U.S.C. § 1512(2)(A). Taking the wire transfers, the communications between Mr. Xin and Ms. Shan, and the threat against Ms. Pui Lam's son together, the Court finds that Plaintiff has sufficiently alleged at least two predicate acts for purposes of civil RICO.

#### ii. Plaintiff's Proffered Predicate Acts Do Not Constitute a Pattern Because of the Lack of Continuity

Nevertheless, Plaintiff fails to allege a pattern of racketeering activity, because those alleged predicate acts were not continuous. Plaintiff contends that his pleadings sufficiently demonstrate "either an open-ended pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (*i.e.*, past criminal conduct extending over a substantial period of time)." *Crawford*, 758 F.3d at 487-88 (internal quotation marks omitted) (quoting *GICC Cap. Corp.*, 67 F.3d at 466). The Court disagrees.

As Plaintiff's arguments reflect, continuity can be closed-ended or open-ended. *See Cofacredit, S.A.* v. *Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999). "Criminal activity that occurred over a long period of time in the past has closed-ended continuity, regardless of whether it may extend into the future." *Reich* v. *Lopez,* 858 F.3d 55, 60 (2d Cir. 2017). "As such, closed-ended continuity is 'primarily a temporal concept,'" *id.* (quoting *Spool*,

520 F.3d at 184), "and it requires that the predicate crimes extend 'over a substantial period of time,'" *id.* (quoting *H.J.*, 492 U.S. at 242). The Second Circuit "generally requires that the crimes extend over at least two years." *Id.* (citing *Spool*, 520 F.3d at 184 ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity[.]")). "On the other hand, criminal activity 'that by its nature projects into the future with a threat of repetition' possesses open-ended continuity, and that can be established in several ways." *Id.* (quoting *H.J.*, 492 U.S. at 241). When, for example, "the business of an enterprise is primarily unlawful, the continuity of the enterprise itself projects criminal activity into the future." *Id.* "And similarly, criminal activity is continuous when 'the predicate acts were the regular way of operating that business,' even if the business itself is primarily lawful." *Id.* (quoting *Cofacredit*, 187 F.3d at 243).

*First*, Plaintiff cannot meet the closed-ended standard. True, the predicate acts span a period of longer than two years (January 2023 to August 2025). But "while two years may be the minimum duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." *Kalimantano GmbH*, 939 F. Supp. 2d at 412 (quoting *Satinwood, Inc.*, 385 F.3d at 181). The Court must also look to "[o]ther factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes … in determining whether closed-ended

continuity exists." *Id.* (internal quotation marks omitted) (quoting *Satinwood, Inc.*, 385 F.3d at 181). In other words, it must "take holistic account of the alleged pattern[.]" *Ramiro Aviles* v. *S & P Glob. Inc.*, 380 F. Supp. 3d 221, 269 (S.D.N.Y. 2019).

Here, considering the entirety of the alleged scheme, Plaintiff's pleadings suggest "sporadic bursts of activity at key points in time … rather than sustained and continuous criminal activity over the whole time period." *Satinwood, Inc.*, 385 F.3d at 172 (internal quotation marks omitted) (quoting *First Cap. Asset Mgmt., Inc.* v. *Brickellbush, Inc.*, 219 F. Supp. 2d 576, 587 (S.D.N.Y. 2002)). Each instance of alleged wire fraud occurred in January or February 2023, when Mr. Xin courted Plaintiff and Ms. Shan for IvyMountain International. (*See* SAC ¶¶ 23-27, 40, 42-43). Only the alleged witness tampering occurred after that "sporadic burst[]," indicating that the "specific racketeering activities" Plaintiff alleges are far from "the sort of 'long-term criminal conduct' that Congress sought to target in RICO." *Satinwood, Inc.*, 385 F.3d at 172 (quoting *Brickellbush, Inc.*, 219 F. Supp. 2d at 587). Instead, Plaintiff's allegations are "more akin to garden variety breach of contract and tort claims than a large-scale civil RICO claim" and thus fail closed-ended continuity. *Chester Park View, LLC* v. *Schlesinger*, No. 23 Civ. 5432 (CS), 2024 WL 2785140, at *10 (S.D.N.Y. May 29, 2024) (quoting *MinedMap, Inc.* v. *Northway Mining, LLC*, No. 21-1480-cv, 2022 WL 570082, at *2 (2d Cir. Feb. 25, 2022) (summary order)); *see also Grace Int'l Assembly of God* v. *Festa*, 797 F. App'x 603, 605-606 (2d Cir. 2019) (summary order) (finding no closed-

ended continuity where only a few defendants defrauded very few victims over 29 months with a "limited goal of defrauding" the plaintiff).

*Second*, Plaintiff cannot satisfy open-ended continuity. Plaintiff has not shown that "the business of [the] enterprise is primarily unlawful" — even assuming that Plaintiff has pleaded the existence of an enterprise, which he has not. *Reich*, 858 F.3d at 60. Nor, assuming a primarily lawful enterprise, has he shown that "the predicate acts were the regular way of operating that business[.]" *Id.* (internal quotation marks omitted) (quoting *Cofacredit*, 187 F.3d at 243). Plaintiff can offer little beyond a few statements made by Defendants in prior filings indicating that they continue to operate an educational consulting business and have lost clients as a result of the instant litigation. (*See, e.g.,* SAC ¶¶ 67, 78). He also gestures at other members of the proposed class but can identify only one person who has had a similar experience with IvyMountain. (*See generally id.*). So, while Plaintiff alleges that "[t]he fraudulent scheme continues to this day" (*id.* ¶ 71), and that Defendants pose a grave threat of future criminal conduct, his allegation does not reflect that Defendants' activity "by its nature projects into the future with a threat of repetition," *Reich*, 858 F.3d at 60 (internal quotation marks omitted) (quoting *H.J.*, 492 U.S. at 241).

Given these various deficiencies in pleading, the Court dismisses Plaintiff's civil RICO claim.

### 3. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's State-Law Claims

A court retains discretion to exercise supplemental jurisdiction over state-law claims even when it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). However, because the Second Circuit "counsels against exercising supplemental jurisdiction in such a situation," this Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims and dismisses them without prejudice to their refiling in state court. *Jus Punjabi, LLC* v. *Get Punjabi Inc.*, No. 14 Civ. 3318 (GHW), 2015 WL 2400182, at *12 (S.D.N.Y. May 20, 2015) (emphasis omitted) (quoting *Satinwood, Inc.*, 385 F.3d at 183); *see also Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Court dismisses Plaintiff's federal claim with prejudice and each of his state claims without prejudice. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated: August 3, 2026
New York, New York

Katherine Polk Failla

KATHERINE POLK FAILLA
United States District Judge